# **EXHIBIT E**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES LLC, *et al.*,[1] | Case No. 17-12560 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 2397** |

**DECLARATION OF FREDERICK CHIN IN SUPPORT OF CONFIRMATION OF THE
FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF WOODBRIDGE
GROUP OF COMPANIES, LLC AND ITS AFFILIATED DEBTORS**

I, Frederick Chin, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.        I am Chief Executive Officer of WGC Independent Manager LLC, a Delaware limited liability company, which is the sole manager of debtor Woodbridge Group of Companies, LLC, a Delaware limited liability company and an affiliate of each of the debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases"). I am also Chief Executive Officer of each of the Debtors. I submit this Declaration in support of confirmation of the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. 2397] (as amended, supplemented, or modified from time to time pursuant to the terms thereof, the "Plan"[2]) proposed by the Debtors.

---

[1]    The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC.

[2]    Capitalized terms used but not otherwise defined in this Declaration have the meanings ascribed to those terms in the Plan.

2.     Since 1979, I have been engaged full-time in providing real estate valuation, consulting, advisory, research, due diligence, financial structuring, ownership, restructuring, and operational turnaround services.  I have served in executive roles as Chief Executive Officer, Chief Operating Officer, and Chief Restructuring Officer of public and private real estate companies involved in homebuilding, land development, and commercial office portfolios in Southern California and Nevada.  Over the course of my career, I have testified as a real estate valuation expert in deposition or trial on over 50 occasions in federal and state courts throughout the United States.  I am a member of the Appraisal Institute and was awarded the MAI Designation in 1987.  I am also a Certified Insolvency and Restructuring Advisor of the Association of Insolvency and Restructuring Advisors, and I hold the CRE designation from the Counselors of Real Estate.

3.     On March 8, 2018, the Court entered an order authorizing the Debtors to retain me as Chief Executive Officer, *nunc pro tunc* to January 29, 2018.  In such capacity, I am familiar with the day-to-day operations and financial affairs of the Debtors.  I am one of the individuals responsible for devising and implementing the Debtors' wind-down and liquidation strategies and overseeing the Debtors' financial and operational affairs, including with respect to the development and sales of real properties during the Chapter 11 Cases.  I have been consistently involved in or am familiar with the Debtors' wind-down activities and development of the Plan, particularly as it relates to the real properties owned by the Debtors.  I am also the individual primarily responsible for developing the Wind-Down Business Plan (as defined below).  I have reviewed and am familiar with the terms and provisions of the Plan and the Wind-Down Business Plan.

01:23758476.1

4.      Except as otherwise indicated, all facts set forth in this Declaration are based on:
(a) my direct personal knowledge of the Debtors' assets, operations, and finances;
(b) information learned from my review of relevant documents; and/or (c) opinion based on
experience and knowledge of the Debtors' business affairs and financial condition.  If I were
called upon to testify, I could and would testify competently to the facts set forth herein.

## I.  GENERAL BACKGROUND

5.      On December 4, 2017, a total of 279 Debtors commenced voluntary cases under
chapter 11 of the Bankruptcy Code.  Thereafter, on February 9, 2018, March 9, 2018, March 23,
2018, and March 27, 2018, additional affiliated Debtors (27 in total) commenced voluntary cases
under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the
Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in
possession.

6.      The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule
1015(b) and Local Rule 1015-1.  No trustee has been appointed in the Chapter 11 Cases.  An
official committee of unsecured creditors (the "Unsecured Creditors' Committee") was
appointed on December 14, 2017 [Docket No. 79].  On January 23, 2018, the Court approved a
settlement providing for the formation of an official ad hoc noteholder group (the "Noteholder
Committee") and an official ad hoc unitholder group (the "Unitholder Committee"), as well as a
replacement board (the "New Board") and management for the Debtors [Docket No. 357].

## II.  THE PLAN AND WIND-DOWN BUSINESS PLAN

7.      Feasibility.  Pursuant to the Plan, after the Effective Date, the Wind-Down Entity
will own and administer the Wind-Down Assets in accordance with the Plan and the Wind-Down
Governance Agreement.  In consultation with other professionals, including professionals
retained by the Committees, I have developed a business plan regarding the Wind-Down Assets

(the "<u>Wind-Down Business Plan</u>"), a summary of which is attached as Exhibit E to the Disclosure Statement.

8.      The Wind-Down Business Plan is premised on the orderly disposition of the Wind-Down Entity's real estate assets through April 2021.  Based on the various conditions and assumptions of the Wind-Down Business Plan, the estimated net recovery proceeds available for distribution to the Liquidation Trust are projected to be approximately $521 million to $583 million.

9.      I believe the Wind-Down Business Plan is a reasonable and appropriate plan for effectuating the liquidation of the Wind-Down Entity's real estate assets and the best available means to maximize the value of such assets.  Moreover, I believe the Debtors' current Cash and additional proceeds to be generated from the Wind-Down Assets will be sufficient to allow the Wind-Down Entity to make all payments that the Wind-Down Entity is required to make under the Plan, including payments to Holders of Allowed Other Secured Claims in accordance with the terms of the Plan and periodic distributions to the Liquidation Trust.

10.     <u>Real Estate Asset Values</u>.  I have prepared a summary (the "<u>Summary</u>," a copy of which is attached hereto as **<u>Exhibit 1</u>**) estimating the aggregate value of the Debtors' Portfolio (as defined below) as of October 16, 2018.  As set forth in the Summary, I estimate that the aggregate market value of the Portfolio as of October 16, 2018 is $620,786,000.  The Summary also includes an estimate of the market value of each individual asset in the Portfolio as of October 16, 2018.

11.     For purposes of this analysis, the aggregate value is defined as the summation of the individual market values of each asset in the Portfolio.  The aggregate value is not to be equated to or construed as the value of the Debtors in their entirety, as if sold to a single

01:23758476.1

individual or entity.  The individual market value of each asset considers its "As-Is" condition, as of October 16, 2018.

12.    For purposes of the Summary, I used the following definition of "market value:"

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition of "market value" is consistent with the Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g] and the Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472.

13.    The Portfolio is comprised of forty one (41) properties located in the Los Angeles, California area, one hundred eleven (111) properties situated in the general Snowmass/Carbondale areas of Colorado, one (1) property located in New York, New York, (collectively, the "Core Properties"), and thirty five (35) assets that include mortgages and real property interests located in North Carolina, Illinois, Texas, Georgia, Florida, Indiana, Pennsylvania, New York, District of Columbia, Ohio, Maine, Wisconsin, and Hawaii (collectively, "Riverdale Properties").  Collectively, the Core and Riverdale Properties constitute

the portfolio of real property assets ("Portfolio") held by the Debtors.  A detailed list of the

Portfolio can be found in the Summary.

14.    To estimate the aggregate value of the Portfolio, I performed the following

procedures:

a)  Conducted on-site inspections of the Core Properties;

b)  Gathered, reviewed and analyzed background information of the Core
    Properties, including previous appraisals, offers to purchase, listing
    agreements, purchase agreements, project management reports, marketing
    information, property inspection reports, preliminary title reports, geologic
    and soils studies, topographic surveys, termite inspections, natural hazard
    reports, sewer inspections, geological inspections, chimney inspections,
    mold and moisture reports, zoning analyses and construction information;

c)  Actively interfaced with the Debtors' third-party project management
    team regarding various details and cost estimates of individual new homes
    under construction;

d)  Met with general contractors and listing brokers; and

e)  Collected market data relevant to the Portfolio.

15.    In formulating my valuation opinions regarding the Core Properties, I considered

the three traditional approaches to value real estate:

a)  Cost Approach: this approach is based on the presumption that an
    informed purchaser would pay no more than the cost of producing a
    substitute property with the same utility.

b)  Income Approach: this approach reflects the relationship between a
    property's income-producing potential and its market value.  This
    approach converts the anticipated net income from ownership of a
    property into a value indication through capitalization.

c)  Sales Approach: this approach assumes that an informed purchaser would
    pay no more for a property than the cost of acquiring another existing
    property with the same utility.

16.    For the Core Properties, sales data was compared for each property and

adjustments were made for property-specific differences.  Critical drivers of value include the

type of view available (partial city, full city, ocean, hillside), new construction, renovation of

01:23758476.1

existing structures or original construction, improvement, and lot sizes.  For those properties under development, "as if completed values" were estimated, minus construction costs and other costs, with consideration given to the estimated time to complete the construction and allowances for profit for the efforts to convert a partially finished home to a completed home ready for sale and occupancy.  The value allows for an incentive/profit for assuming the construction risks, and for the time value of money expended to acquire and construct a home.

17.    With respect to the Core Properties, the Income Approach is not applicable, as the subject residential properties are not bought and sold based on their income-producing ability. The Cost Approach has been considered, mainly since several of the properties have been or are under construction.  The Sales Approach is most applicable, as it relies on transaction activity in the market area.  Sufficient relevant information exists to use and compare to the Core Properties.  The Sales Approach and Cost Approach were used for projects that are under construction, whereby the costs to complete and total costs to date, as well as profit, have been considered in the valuation estimates.

18.    For the Riverdale Properties, I used the Sales Approach for real estate assets and where applicable, discounted those indications for mortgage interests.  The discounted approach considers the time, effort and costs that would be incurred to recover amounts relative to the outstanding loan balance.  Consideration was also given to reflect the incentive a third party would require for the time, effort and costs expended to achieve recovery.  For all Riverdale Properties except those that are Real Estate Owned, I estimated the net recovery either via repayment of the loan or foreclosure on, and subsequent sale of, the applicable property.

19.    For purposes of the Summary, the presumed marketing and exposure period for the assets in the Portfolio is 12 months.  My valuation estimates assume cash transactions that are unaffected by any favorable or extraordinary financing arrangements.

20.    <u>Executory Contracts</u>.  I believe that the executory contracts and unexpired leases (i) that the Debtors have chosen to assume and assign to the Wind-Down Entity are those that may be necessary for the Wind-Down Entity to carry out its duties under the Plan and effectuate the orderly wind down of the Wind-Down Assets and the Wind-Down Business Plan, and (ii) that the Debtors have chosen to reject are no longer necessary for those purposes and would otherwise be a net burden on the Estates.  Accordingly, I believe the Debtors have exercised sound business judgment in identifying the executory contracts and unexpired leases to be assumed and assigned, or to be rejected, pursuant to the Plan.

Executed this 19 day of October, 2018, at Los Angeles, California.


*/s/ Frederick Chin*
Frederick Chin

01:23758476.1

**<u>Exhibit 1</u>**

**Summary**

# SEALED